The first case for consideration is United States v. Cordova. It is docket 20-2007. And Ms. Taliaferro, we are ready to hear you when you're ready to present your argument. Thank you, your honors. Anne Taliaferro and Mr. Smolin is also appearing on behalf of the Mr. Smolin and I are going to split our argument today. I will take about six minutes and Mr. Smolin will take about seven minutes. And with permission of the court, we'll focus the court's attention on two of the issues that we've raised in our brief that we believe are related. I will first discuss with the court our contention that the government did not present sufficient evidence at trial for one of the necessary elements of the vicar charge and meet their murder-for-hire agreement and that that agreement was on behalf of the enterprise, in this case, S&M. Then Mr. Smolin will discuss that after the trial, new evidence arose from the horse's mouth, so to say, confirming that there was actually no agreement. Well, first of all, for my part, one of the elements of a vicar charge is that, in this case, a murder, but a murder or a violent act, was committed on behalf of an enterprise charged with racketeering activity in that there was payment or a promise to pay from the enterprise or the purpose of the murder was for the actor to gain or maintain or increase a possession of the charged enterprise. This is what some courts refer to as the motive or the purpose element, but this element, which is also the jurisdictional link that turns just a regular state murder charge into a federal crime. So the jury here rejected the option that Mr. Cordova's purpose was to gain or maintain or increase the position in the enterprise. So the only option here was the murder-for-hire option, which required the government to show two things. One, a quid pro quo agreement to do the murder, that before the murder happened, there was an agreement to kill as consideration for payment or a promise to pay in the future. And then secondly, this promise or agreement or payment was made by the enterprise or one acting on behalf of the enterprise. Does this payment have to be money or can it just be increased importance within the gang? The murder-for-hire provision, it doesn't have to be money. It could be drugs, perhaps. It could be something else, but I don't think it could be increased, I don't know, status in the gang, because that is a different provision. And the court specifically, or the jury specifically found that that was not found here. So we're dealing for the murder-for-hire for a pecuniary game in this case. Was there evidence? Go ahead. After you, please. I was just going to ask the question in regards and looking at what Judge Browning ordered. Did you actually raise this argument in front of Judge Browning before the district court? Browning says you did not. I believe in the first motion for new trial, the trial council did raise this issue in the first motion for a new trial. And they said that there was insufficient evidence in the case to show a link to the enterprise and to show that there was an agreement. Well, I'm looking at page 116 of Judge Browning's order. He says you didn't raise it. And I don't, and I'll have to go look at that, Your Honor, but I don't know where that would be because it's my belief that this was raised in the motion for a new trial and it was ruled on by the court. May, I just wanted to ask you, so you could tell me how you read it and if it was really. I believe it was raised and I believe it was also ruled on because I believe the judge indicated that there was a link to the enterprise because based upon the courts or based upon the where supposedly everything that the government now argues is supporting the judge's ruling as to why he found that there was sufficient evidence in this case. Well, isn't there evidence here that there was given drugs and money? After the fact, but. Well, isn't that usually when you get paid, it's after the fact? But the problem is like in some of the cases cited the United States versus Ferguson case, just because there was perhaps drugs given after the killing or perhaps because there was money paid after a killing, there needs to be evidence connecting those drugs and money or whatever was paid to an agreement made before the killing. Well, you know, you don't dispute the first part then what were that you've just described. You don't dispute that there's evidence that drugs and money were given after the murder. At some point in time after the murder, there was evidence from one of the co-defendants that that Mr. Cordova was given, I believe, a wad of cash, but he didn't know how much, was given some drugs and he was given a suburban at some point. And it was almost contemporaneously, wasn't it? It wasn't it the next night? I don't believe it was the next night. It was some point afterwards in the back, because according to the evidence, C.G. had gone to Las Vegas. So it could have been two weeks later. It could have been. I don't believe it was the next night, but some point when he came back from Vegas in his brother's backyard, Mr. Montoya testified that he saw Mr. Cordova being given money. Isn't that the jury's call? Are you just asking us to substitute our opinion for the juries? I'm not asking the court to substitute its opinion for the juries. I am asking the court not to speculate that this money was for this murder. And there has been no evidence to show that connecting this money, connecting this drugs as payment for this murder. And not only that, not only is there no connective evidence connecting this money to the payment for the murder, but the government concedes that there is no direct evidence that there was ever any agreement to pay Mr. Cordova on behalf of the enterprise for this murder. What do you mean by agreement? A written contract? Certainly there's not that. No, there's not that. And I don't mean a written contract, but there has to be some evidence of an agreement between Mr. Cordova and this person that he will, a quid pro quo agreement, that he will be paid or he will be paid in the future for killing Mr. Dix. And there's just absolutely no evidence of that. That leads me to work right back to what I was thinking Judge Browning said. Let me read you, and I'm quoting, it says preliminarily the court concludes that A. Cordova does not contest that sufficient evidence suggests that Cordova committed the Dix murder in consideration for a promise of something of pecuniary value. I'm quoting what Judge Browning said. Now, what you've said is that there's no evidence of that existing. Is that right? That is, that is your honor. And I guess I'm a little taken aback because I didn't see, I honestly didn't see that. The government has pointed that out. I thank the court for pointing that out and let me look at that. But my position was, and it always has been that I believe that this was preserved, this was raised. And at least if the agreement wasn't there, as the court indicates, at least the argument was raised that it wasn't paid on behalf of the enterprise to make that jurisdictional link. What I just read is in the district court's order at page 116. Okay, I will look that up. And at this time, I'm going to pass the podium to Mr. Schmoen. Good morning, your honors. May it please the court and counsel. As my co-counsel just mentioned, I'm hoping to address the court on the issues in the second motion for new trial. Even if this court were to find that the speculative evidence that the government put on of the murder for hire agreement in trial was sufficient to meet that element, we believe that the exculpatory statements made after trial of the purported other party to that agreement, specifically his statements that he did not ask our client to murder the victim Dix, is absolutely relevant and is new evidence under Rule 33b1 and would warrant a new trial. There's three alternative theories under which C.G.'s statements could be admitted at a new trial for the truth of the matter. First, if he were to invoke the Fifth Amendment, and that's speculative that he would do so because he hadn't been sentenced at trial when he was first subpoenaed by the defense, but obviously it has been sentenced now, but if he were to invoke the Fifth Amendment at a new trial, we believe that that Fifth Amendment could be overruled by court. Because you think there is absolutely no possibility of any criminal charge being brought by any entity, state, federal, or whatever. That's correct, Judge, and that's for a couple of reasons. That's a big assumption. It is, Judge, but this is sort of a special situation. First of all, the federal government has already promised not to bring additional charges in the plea agreement for arising out of any of the facts forming the basis of any of the three indictments that this person was associated with. The federal government below in its argument suggested that they might want to prosecute this person for perjury if he testified again, but they seem to have abandoned that argument in their brief because the only thing they point to in their appellate brief is the possibility of future state prosecution. But that in itself is speculative and remote. The case law tells us that the future... Counsel, let me ask you this question in following up to what Judge Briscoe is, where she's going. If the appellate can't meet the Sinclair test, in this case, is this issue even relevant? You're raising. Well, it's relevant to Sinclair, and that's because... I say if you can't reach the Sinclair test, is this issue even relevant? Well, I think, Your Honor, I believe what we're talking about is an aspect of the Sinclair test because Judge Browning below, when he was ruling on the other factors of Sinclair, so for instance, the factors three through five having to do with materiality, whether it was mere impeachment evidence, likelihood of producing an acquittal at new trial. When he was making those rulings, he was doing so under the assumption that this new testimony couldn't come in for the truth of the matter. He was clearly assuming that it could only come in as an impeachment question to Montoya, one of the other government's witnesses. And that's clear in his ruling because he makes a few what would seem on their face conflicting conclusions. The first of which, and here I'm quoting from Sealed Volume Two, page 543, and that's part of the judge's order, obviously. He says, the statement that C.G. did not ask Cordova to murder Dix and did not speak to Cordova about the Dix murder after it occurred is not material to this case because it would undermine Montoya's credibility by contradicting his testimony that C.G. asked Cordova to kill Dix is merely impeachment evidence. So that was his ruling on the Sinclair factors. However... The second factor is the one really in play, and that's what I think Judge Ball is getting more to, which is, why should we think that the outcome of this trial would have changed based on that statement that he didn't, quote unquote, ask him to? And that kind of gets back to the formal contract thing, particularly when there's other language in this interview from Garcia about understanding that the insinuation that Montoya should get a better price or something, what the insinuation was related to the homicide of Shane Dix and so forth. It's not just that one word, ask. There's more to it than that. Yes, Judge. And to answer that question, I would point to another section of Judge Browning's ruling, and this is where he was ruling on an aspect of the selective immunity analysis. And in that analysis, he's clearly assuming that if the statements came in for the truth of the matter, the court concluded, if C.G. under a grant of immunity testifies at a new trial, the jury can consider the statement for its truth and decide how to interpret it and how much weight to give it, and their decision could change this case's outcome. So on that aspect, I think Judge Browning himself is admitting that if these statements came in for their truth, they could indeed change the case's outcome. And that's why the Fifth Amendment issue is so important because that defined how the trial court was ruling on those other Sinclair factors. And obviously, we believe that if he had decided it could come in for the truth of the matter, then that would have changed his ultimate ruling on the likelihood of producing an acquittal. And I see my time is up. Thank you, Judge. Thank you, counsel. Thank you. Ms. Walters. Many honors. May it please the court, counsel, Tiffany Walters for the United States. The district court did not abuse its discretion in refusing Cordova a second trial. Viewing the evidence in the light most favorable to the government, a reasonable jury could have for higher agreement with C.G. to kill Shane Dix on behalf of S&M in exchange for cash and drugs. The post-trial statements by C.G., Cordova's co-conspirator, changed nothing. They would not be admissible at a new trial, and even if they were, they are not newly discovered evidence and would be unlikely to change the outcome of the trial. If it pleases the court, I'll address the arguments in the same order as the appellant raised them. So first, moving to the sufficiency of the evidence. There was ample evidence from which the jury could find a murder for higher agreement. First, there was evidence that it was commonly known in S&M circles that C.G. would pay for Dix's murder. Michael Sullivan testified that C.G. had a contract on Dix's life. Mario Montoya testified that everyone knew that C.G. was willing to pay for the murder. And Cordova was C.G.'s personal runner, and the jury could infer that he was aware of the same information that everyone at S&M was aware of, that C.G. was willing to pay. Four S&M members testified at trial that C.G. in fact solicited them to murder Dix in exchange for consideration, either drugs or debt forgiveness or cash. Julian Romero testified, Steven Morales, Billy Cordova, and finally Mario Montoya, who accepted C.G.'s offer. When C.G. became a patient... Well, can we look at all of this and say, well, all right, these things happened. He wanted this guy killed. He sought out someone to do the killing. The killing happened, and the defendant, we think here, according to the evidence, did the killing. How does that tie this back to the gang? I mean, couldn't it be, as it's been argued, that it's just a personal vendetta? So, going to the question of whether or not it's tied to the gang, that really goes to C.G.'s motive. Is C.G. acting on a personal vendetta for being shot, or is he acting as an S&M member? And in this case, there's many of the types of evidence that this court has recognized in the context of the murder for hire when you're looking to improve your position or maintain your position in the gang that are relevant here and show that C.G. was motivated to murder Dix, not only for whatever personal motives he would have had, but also to maintain his position in the gang. There was testimony that S&M regularly engaged in violent murders and assaults, that this was part of the S&M culture, that it was required in order for S&M to maintain respect and control in the prisons, that, in fact, S&M required its members to retaliate. And if C.G. didn't embark to retaliate, he could be subject to punishment by the S&M. For all those reasons, it suggests that this is, in of S&M. In addition, C.G. reached out to who? To four S&M members to conduct this murder and eventually pulled in his personal associate, an S&M associate, to help in that process. And also, you can see the centrality of this murder to S&M when you look at the way S&M talked about this murder. So as soon as C.G. was shot, that was widely disseminated within S&M. And also, when C.G. retaliated and, in fact, had Dick's murder, that information was also spread widely within S&M. The retaliation against Dick's was an integral aspect of C.G.'s S&M membership, and it can't be separated from that. And for that reason, it was, in fact, on behalf of S&M. Counsel, I want to follow up on Judge Briscoe's question to you. Do you have to, in this case, show some organizational control or inputs for the crime to be done by the enterprise? Do you have to show that? I don't believe that this operates sort of along the strict contract principle lines, because we're dealing with a criminal enterprise. I think the most helpful precedent in looking at what level of organizational control or involvement is required is perhaps... What do you... You're saying you do not have to show that? Is that your position? Or you did show it? Well, I think, in fact, we did show that Billy Cordova testified that, in fact, S&M issued a green light on Dick's and, in fact, ordered a hit on Dick's. So, I think there is actual evidence that S&M ordered this murder. Now, any organization has to work, just like a corporation, has to work with individuals. And so, we look, in terms of C.G.'s involvement, we know from Kamihili that there doesn't have to be some sort of common pot of money in order to have the murder committed on behalf of S&M, but we're looking to whether or not C.G.'s acting as an S&M member or in his personal capacity. And here, looking at the types of evidence that this court has considered in Smith and Kamihili, the connection to S&M, the culture of S&M, the centrality of these acts of violence to S&M, and the need for retaliation, that's sufficient. The green light that you're talking about, that was before the whole Dick's episode, wasn't it? Correct. So, Dick's had remained alive despite this green light for a period of time. Sure. So, Billy Cordova testified that there's sort of two levels, if you will. The green light would remove S&M protection, it would allow individuals to kill him if they encounter him, but a hit is more of a seeking him out. And so, it escalated to a hit where they would seek out Dick's to kill him after C.G. was shot. And then, just finally, moving back briefly to the agreement issue, I know Judge Baldock, you had mentioned that Judge Browning had found that the issue was not preserved below. We did not argue plain error review because the court, in fact, briefly addressed it itself. And so, we felt that that would be sufficient. Judge Browning addressed a lot in this case, didn't he? Judge Browning is very thorough, yes. Thorough may be an interesting word. I think you're being kind. But to go directly to the evidence of agreement, it would be lovely if we had direct evidence of a conversation in which we had C.G. offer X amount of money in exchange for the murder and Cordova accepted. But the reality is that that is not how murder for hire is committed, and that's not the type of evidence the government typically has to prove it. Here, on top of the evidence that C.G.'s willing to pay, and everyone knows it, we have a conversation between C.G., Cordova, and Montoya in which C.G. says to Montoya that Cordova knows Dix, knows where he hangs out, and asks him to see if they can't handle it together. And Montoya understands this to mean murdering Dix. So, that combined with the evidence that he was, in fact, paid the same night Montoya was paid for the murder, that Montoya saw this, and that Cordova told Montoya that C.G. bought him a Suburban, or helped him buy a Suburban after Cordova disposed of the murder vehicle, all that supports that, in fact, this was a murder for hire agreement. I'd like to move on, if there's no further questions on sufficiency of the evidence, to the second motion for the new trial. The post-trial statements by Cordova's co-conspirator C.G. do not entitle him to a new trial. So, one threshold issue in determining whether the new trial is warranted is whether or not there would be admissible evidence. Now, I believe Judge Baldock asked about whether or not, or perhaps it was Judge Phillips, I'm sorry, whether or not Sinclair factors are sufficient to deny it, or whether or not we look to the Fifth Amendment. And in this case, the court could deny it on either basis. If there's no admissible evidence, then there's no reason for a new trial. Also, if the evidence that is admissible doesn't meet the Sinclair factors, there's no basis for a new trial. So, the court could decide this issue on either basis. Addressing the Fifth Amendment argument, the plea agreement clearly binds only the U.S. Attorney's Office for the District of New Mexico. State officials could still prosecute. And whatever Cordova's arguments about the likelihood of that standard for Fifth Amendment is so very high that he must show with perfect clarity that the testimony could not possibly have a tendency to incriminate him. And here, even if that could be said about the murder, which we don't believe it could, the likelihood that he'd be subject to cross-examination and may end up testifying regarding whatever additional criminal acts that occurred as part of S&M activities is sufficient to invoke the Fifth Amendment. But moving on to the Sinclair, in addition, Cordova raises the argument that they could be admissible as statements against interest. But here, these statements are not sufficiently against his interest to give them that clear trustworthiness that would be required. Because they were vague? Because they were vague? Well, admissions against interest, you're talking about C.G.'s interest? Correct. Okay. Whether or not it be against C.G.'s penal interest. Right. And here he had already admitted that he hired someone to kill Dix and he attempted to negotiate this plea agreement to not identify that person. And all that's happening pursuant to the protection of Castigar is he's identifying, I worked with this person and not this person. And while that might be argued to be somewhat exculpatory as to Cordova, it's certainly not additional inculpation of C.G. So a reasonable person wouldn't believe that that would subject him to additional criminal liability. And then moving to the Sinclair factors. As this court noted, the key is whether or not there's a probability of a different outcome here. Whether or not there's probability that with this new evidence, assuming it could be admitted, that would produce an acquittal. And here we have substantial trial evidence that Cordova in fact committed this murder for hire. And we have testimony from C.G. specifically as to the conversation in which they appeared for the murder. We have testimony as to compensation after the fact. And then the statements themselves are at best ambiguous and in some ways more inculpatory of Cordova. So C.G. first makes clear that he's speaking in code in some ways, much as Montoya testified that he does. He talks about how he asked Billy Cordova to rock Dix, but in fact didn't mean kill him. And then he asked Montoya, but he says he doesn't ask Cordova to kill Dix, but he also stopped Montoya from giving any details and doesn't really know who killed Dix. And in the end, he says that while he and Cordova didn't talk about the murder after the fact, he admits that Cordova references the murder as the thing he did for him and did so in exchange for drugs, either free or reduced price drugs. So all of these statements would also come in. In addition, C.G. corroborated that he helped Cordova purchase the truck. They paid Cordova for other tasks. And the recording that was largely inaudible was in fact him complaining about Cordova talking about the Dix murder. But in the end, another piece of the court, the district court and this court would have to consider whether or not it would produce an acquittal is the likelihood that the jury would credit this testimony and that it would change the outcome. This is the type of testimony that most courts won't allow to create a new trial just because these statements by a co-conspirator after the fact are inherently suspect. There's no reason why C.G. would have anything to lose by getting Cordova off the hook after the fact. In addition, the district court found that S&M members regularly lie to hide their crimes. This is consistent with S&M activity and it's consistent with the S&M rule of silence. C.G. specifically crafted his plea agreement in this case to avoid snitching on anyone, to avoid identifying the person he hired to kill. And here in this post-trial statement, he's following the S&M code of conduct too and limiting his exposure from S&M by saying, you know, the person who I worked with, it's the person who's already out in the open, has testified, has been very clear about his role in this murder. But the person who I didn't talk to, that I didn't ask, is the individual who is still fighting his conviction. That in itself makes the statement suspect. In addition, this court could deny or this court could affirm the district court's denial of the motion because this isn't newly discovered evidence. This was information that was known to Cordova. Cordova knew what he had and hadn't talked about with C.G. and in Muldrow, this court said that that's the type of evidence that it's not willing, that is not newly discovered evidence, where the defendant knew of the evidence and the only reason it wasn't presented at trial was because the co-defendant or co-conspirator had pled the fifth and that's exactly what happened here. What was the case you decided? Muldrow. United States v. Muldrow, 19-3-1332. And the court held if a former co-defendant who originally chose not to testify subsequently comes forward and offers testimony exculpating a defendant, the evidence is not newly discovered if the defendant was aware of the proposed testimony prior to trial. And while we did not raise this issue below, this is an alternative ground on which the court could affirm as it's supported by the record. But if it chooses not to, the probability, the lack of a probability of a different outcome is sufficient for this court to hold that the district court did not abuse its discretion in denying Cordova's motion for a second trial. If there's no further questions, we'll rest on our briefs. All right, counsel, thank you for your arguments. The case is submitted and counselors are excused.